**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-337-RCL** |
| **DERRICK EVANS,** | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Derrick Evans to three months' incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment for Evans's single count of conviction.

### I.    INTRODUCTION

The defendant, Derrick Evans, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million in losses.[1]

Evans, a former West Virginia state legislator, joined the storming of the Rotunda

---

[1]    As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

(Columbus) Doors after livestreaming the mob on the East Side of the Capitol building for over an hour to his public Facebook page.  While livestreaming, Evans carefully narrated what was happening both from his vantage point on the East Side of the Capitol and in other areas around the Capitol, such as the violence against police officers occurring on the West Front before any breach of the Capitol building.  Evans also made clear his enthusiasm for what was happening— he cheered each advancement of "patriots" against police on all sides of the Capitol.  He urged rioters around him to "take" the Capitol and he told them that the certification of the electoral college vote was paused "because of protestors" and that "patriots" made it onto the Senate floor. Evans whooped and hollered throughout his livestream, telling his followers, "Guys, oh my gosh, I can't even explain what is happening right now, how amazing this is to see in person.  I am in awe.  The revolution has started.  The revolution has started!"

After breaching the barriers around the restricted area, Evans was part of the crowd on the East Terrace that pushed against police near the Rotunda Door.  While rioters at the front of the mob assaulted police, Evans—from approximately 20 feet back—was yelling "Move! Move!" and saying, "There's cops on the inside stopping us now!"  After the doors were breached, Evans enthusiastically pushed forward, saying, "The door's cracked! We're goin' in!"  As he passed the threshold into the Capitol building, Evans cheered, "We're in! Derrick Evans is in the Capitol!"

Evans deleted his Facebook livestream video shortly after posting it, so it is impossible to know how many people watched as Evans and the mob violently breached the U.S. Capitol. However, based on the number of comments that Evans received while the livestream was ongoing, and on the number of likes, comments, and shares on his other Facebook posts, it is fair to say that Evans's social media promotion of the riot was significant.  Even though he realized almost immediately that he should delete the video because it was incriminating, he encouraged

his followers throughout the hour and 18-minute livestream video to share the video. Even after the video was deleted, it was disseminated widely over the internet.

The government recommends that the Court sentence Evans to three months of incarceration, which is the mid-point of the advisory Guidelines' range of 0-6 months. A three-month sentence reflects the gravity of Evans's conduct, while acknowledging his admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters, Evans among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.   Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.   Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started out calmly enough.   As set forth in the PSR and the Statement of Offense incorporated into Evans's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol.   Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the

3

November 3, 2020, Presidential election.  By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol.  Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.  At approximately 12:53 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended.  The proceedings resumed at approximately 8:00 p.m. after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.  (*See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 18-23.)

### *Injuries and Property Damage Caused by the January 6, 2021, Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy."  *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).

Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration

(May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.      Evans's Role in the January 6, 2021, Attack on the Capitol**

On January 6, 2021, Derrick Evans was an elected state representative in the West Virginia House of Delegates, representing West Virginia's 19th District. He was also a landlord and real estate investor. (PSR ¶78.) He had previously been a teacher and football coach. (PSR ¶80.)

Evans traveled to Washington, D.C., from Burlington, Ohio, starting very late on the night of January 5, into the very early hours of January 6. Evans traveled with a bus full of others traveling to D.C. to attend the "Stop the Steal" rally and hear former President Trump speak. Before Evans traveled to D.C. for the rally, he made several relevant public posts on his public Facebook page, "Derrick Evans – the Activist." For instance, on December 28, 2020, Evans posted

an image of former President Trump including the words, "FIGHT FOR TRUMP" and "JANUARY 6, We're Comin'!"  Evans included the caption, "Anyone else going to DC on Jan 6th?"



*Exhibit 1A – December 26, 2020, post from Evans's public Facebook page promoting the January 6 rally.  2.8 thousand likes, 333 comments, and 900 shares.*

On December 30, 2020, Evans posted another image of the former president, with the words, "TAKE AMERICA BACK.  BE THERE WILL BE WILD.  D.C. JANUARY 6, 2021," and Evans added the caption, "One week from today! Who's going?"



**Derrick Evans - The Activist**
December 30, 2020 at 10:53 AM · 

One week from today! Who's going?



1,098 Likes · 74 Comments

*Exhibit 1B – December 30, 2020, post from Evans's public Facebook page promoting the January 6 rally.  1,098 likes and 74 comments.*

On December 31, 2020, Evans posted another image of the former president, with the text, "A STORM IS COMING…AND THERE IS NOTHING THE LEFT CAN DO TO STOP IT!" On January 5, 2021, at 6:59 p.m., Evans posted a photo of Washington, D.C., with the caption, "We have two charter buses leaving the local area in 3 hours. I can't wait for tomorrow. #StopTheSteal."  At 10:06 p.m., Evans posted a photo that appeared to show individuals seated inside a charter bus with the caption, "Two bus loads of Patriots from WV, KY, and Ohio are loaded up and heading to DC. #StopTheSteal."  At 1:21 a.m. on January 6, 2021, Evans posted a screenshot of a tweet by the former president that read, "Just happened to have found another 4000 ballots from Fulton County.  Here we go!"  Evans added the caption, "This is why we are going to DC. #StopTheSteal."



*Exhibit 1C – January 6, 2021, post from Evans's public Facebook page promoting Evans's belief in election fraud, utilizing the #stopthesteal hashtag, and including the caption, "This is why we are going to D.C."  647 likes and 145 comments.*

On January 6, Evans set out to attend the former president's speech but, seeing the length of the line, decided to go straight to the Capitol building.  Evans spent several hours on the East Side of the Capitol Building and observed the crowd swell from approximately fifty to thousands of people.  Before the breach of the barriers at the periphery of the restricted area on the East Side, Evans and hundreds of others faced off with Capitol police officers guarding the barriers.  The crowd, including Evans, grew increasingly agitated and excited as they became aware that rioters were overwhelming police officers on the West Side of the building.

About 30 minutes before the bike rack barriers were breached, Evans began recording a Facebook livestream video.[2]  Evans narrated what was going on for his followers, who, in turn,

---

[2]     This video has been marked as "Exhibit 2" and shared with the Court and defense counsel via USAfx.

provided him real-time updates about what was happening on the other side of the building via live comments on the video:

- At about 1:34 p.m., Evans—who had just learned that "patriots" had breached barriers on the West Side and were getting "maced" by police—zoomed in on Capitol Police near the building, saying: "There they are!  They got their riot gear!  I'mma get my helmet!"

- At about 1:35 p.m., a protester with a bullhorn said:  "Mr. Police Officer… we want you to understand something… we want Donald Trump, and if Donald Trump isn't coming, we are taking our house!"  Evans excitedly yelled, "YEAH!!" in the background, before adding, "This is about to get wild.  It is about to go down, man… I think that you might want to get bail money ready for people who are going to do this."

- At about 1:45 p.m., Evans, who had previously been about 15 feet away from the barriers and police officers on the other side, approached the barriers, and began shouting directly at the officers:  "We're taking this country back whether you like it or not! … Shame on all of you! … You listen to your liberal mayor instead of the Constitution … Patriots ain't being quiet anymore.  Patriots ain't gonna stand down to tyranny anymore! Patriots ain't gonna stand down for stolen elections anymore!"

- At about 1:58 p.m., Evans says, "I bet Trump would pardon anybody who gets arrested for goin' in there."



*Exhibit 2A – Screenshot from Evans's livestream at marker 29:43, showing rioters grappling with police and bike racks*

Starting at about 1:58 p.m., Evans's livestream video shows rioters grappling with the bike rack barriers, ultimately pulling them away from the police.  Even without the barriers to protect themselves and the Capitol, Evans's video shows Capitol Police trying to hold their line and hold rioters back.  As this was happening, Evans said, "For the record guys, I'm not touching anything I am just here to watch and film and support people and try to keep the peace, but peace is over with."  After a breach of the barriers on the North end, rioters closer to the center of the Plaza (where Evans was standing) charged—then overwhelmed—police.  Rioters can be seen flooding into the restricted area on the East Plaza of the Capitol, screaming and cheering as they went.

11

Evans can be heard on video: "They're in. We're in. Everybody's in!"  As he followed the crowd toward the Capitol building, he said, "We're in; there's too many for them [the police] to do anything about it.  Every side, every angle! Oh my gosh!"  Another rioter screamed in the background: "I want Chuckie Schumer!!"  Evans continued narrating, intermittently expressing his shock and excitement about what he was seeing.



*Exhibit 2B – Screenshot from Evans's livestream at marker 30:25, showing rioters flooding into the East Plaza*

As Evans approached the Capitol, he began chanting, "We want Trump!" along with the crowd.  He shouted, "We're in baby. We're going in that building in a minute, I told y'all!"  Evans then laughed maniacally, "We're in baby! Share this video! Share this videooooo!"  Evans then

flipped the camera around to "selfie mode" while yelling, "Let's goooo! Wooooo!"   He was wearing what looks like an open-face motorcycle helmet on his head.



*Exhibit 2C - Screenshot from Evans's livestream at marker 33:05, showing Evans facing the camera in "selfie mode," wearing a helmet, and yelling, "Let's gooooo!"*

Evans flipped the camera back around, showing the crowd in the East Plaza, including people climbing on tactical vehicles.  "Let's go! We took it over! We took it over!"  Evans laughed maniacally again.  He shouted, "Freedom! Freedom! Liberals better know, America has woken up! The patriots in this country have had enough!"  The crowd, along with Evans, began chanting, "Stop the Steal!"

At about 2:03 p.m., Evans's livestream showed a thin line of police at the base of the East Steps of the Capitol, trying to prevent rioters from progressing toward the building.  Evans, who

was about 10 feet away from the line, admonished others to "keep it peaceful."  Officers with M4 rifles were visible at the top of the steps.



*Exhibit 2D - Screenshot from Evans's livestream at marker 34:48, showing crowd at the base of the East Steps, blocked by Capitol Police, and a secondary line of police at the top of the steps holding rifles.*

Evans continued shouting:  "We pay the electric bill here.  This is our house!"  Evans panned back and addressed the crowd, "Tell them to come on!" as other rioters waved the crowd in the Plaza forward, toward the East Steps.  The crowd at the base of the steps pressed against the line of Capitol Police as Evans said, "It's now or never!"  The line of police fell back to the top of the steps about 30 seconds later.  Evans shouted, "Here we go! We're going in! … Holy crap man!"

Evans made his way to the upper terrace outside the Rotunda Doors and panned the camera over the mass of people filling the East Plaza.  He exclaimed: "We're in here now, they can't stop

us now, there's too many of us."  He flipped the camera around to selfie mode again, and shouted,

"WOOOOO!"  He narrated: "Look at this view, look at this view!  We're on top outside.  They're

flooding in still, look!  They're flooding in from other areas!"  Evans pans to show the East

Rotunda Doors:  "They're pounding on the doors!  We're taking this house, I told you today!

Patriots stand up!"

A loud bang can be heard coming from the direction of the Rotunda Doors.  "Tear gas,"

Evans responds, then he moves closer to the Doors, pushing his way through the crowd.  "I wanna

smell it," Evans says, "Let's go."

Someone in the background said, "It's time to leave."  Evans immediately responded:

No it ain't! The Doors are open! The Doors are open! It's no time to leave! We
haven't done nothing yet! … On the back side of the Capitol!  American Patriots
have took a stand!  We're at the Doors, knocking and pounding on the doors.  We've
taken over the balconies, on top of vehicles!

Evans chanted, "Hold the line! Hold the line!" then said, "I got a headache from screaming… My

people didn't vote for me because I was a coward."  After laughing maniacally again, Evans

exclaimed, "This is the coolest thing I've ever been a part of!"  Minutes later, Evans told his social

media followers, "Guys, oh my gosh, I can't even explain what is happening right now, how

amazing this is to see in person.  I am in awe.  The revolution has started.  The revolution has

started!"

Shortly after that, Evans mused, "Capitol is on lockdown! Wonder what happens if they

don't get to certify the votes today, how does that play into things?"  At about 2:22 p.m., Evans

announced to his social media followers, "Voting paused because of protestors!  Voting paused

because of protestors!  Voting is paused because of protestors!"  People cheered in the background.

Evans said, "Yes, Yes, certification vote is paused due to protestors.  We did that… It's time to go

in."  Later, around 2:28 p.m., Evans saw that the Rotunda Doors had opened and said, "I'm going in if I can get up there."  He then shouted to the crowd, "Patriots are on the Senate floor! Patriots on the Senate floor right now!"  Members of the crowd can be seen and heard clapping in the video.

Around 2:36 p.m., Evans moved closer to the East Rotunda Doors, joining a mob of rioters actively pushing against those Doors and boxing in police officers who were trying to block rioters' access to the Doors.  Rioters screamed at, pushed, pulled, and otherwise assaulted these law enforcement officers guarding the Doors, eventually breaching that entryway.  In Evans's Facebook livestream, Evans can be seen approximately 20 feet away from the Rotunda Doors before they were breached:



*Exhibit 2E - Screenshot from Evans's livestream at marker 1:07:08, showing Evans's position relative to the Rotunda Doors at apx. 2:36 p.m., before they are breached*

Evans narrated what he saw and heard immediately before and as he entered the Capitol:

- As the screaming crowd pushed in the direction of the Doors, Evans said, "It's time to go; they're in on the other side! The other side's in! The other side's in!"

- Another rioter sprayed a chemical irritant in the direction of police officers. Evans coughed and choked, then said, "They're pepper spraying." Evans later stated that he could not see and that he was pepper-sprayed in his right eye.

- Evans's video panned away from the Doors, appearing to capture a police officer getting away from the doors. Evans said: "The cops are running. The cops are running!" then, "Here we go! Here we go! Open the doors." Another rioter shouted, "Whose house?!" and Evans yells back, "Our House!" These chants continued for several rounds.

- Evans stated, "We're at the door now. There's cops on the inside stopping us now." At this point, Evans was much closer to the Doors, approximately ten feet.

- Evans flipped the camera around to "selfie mode," and showed himself, wearing a helmet and yelling "Trump!" in response to another rioter shouting, "Who's your president?!" Evans enthusiastically yells, "Woooo!"

- As the Rotunda Doors were pried open, Evans yelled, "The door's cracked! We're goin' in!" Alarms blared overhead as Evans approached the Doors. Evans, along with others, began yelling, "Move! Move! Move!" as the crowd squeezed toward and through the doors, and repeatedly said "We're in, we're in." Evans yelled, "Are they still fighting cops there?"

- Once he made it through the doors, Evans exclaimed, "We're in! Derrick Evans is in the Capitol!"

17



*Exhibit 2F - Screenshot from Evans's livestream at marker 1:11:55, showing Evans's view of the Rotunda Lobby just after he enters the Capitol building, yelling "Derrick Evans is in the Capitol!"*

Evans entered the Capitol building at approximately 2:40 p.m.  He walked through the Rotunda and Statuary Hall.  In the Statuary Hall, Evans asked other rioters, "what's going on back there?" and pointed in the direction of the House of Representatives chamber.  One rioter responded, unintelligible at first, but then, "they're trying to break down the fucking door to their chambers."  Evans replied, "oh shoot," and started walking in the direction of the House.  Another rioter can be heard in the background, saying, "Where they counting the votes?"  Evans chanted "USA! USA! USA!" with the crowd outside the House chamber, before turning around and walking back toward Statuary Hall and the Rotunda.

While inside, Evans continued recording his livestream.  As he walked around, Evans shouted at others not to break or vandalize anything and reminded them that they are in a historical building.  Evans was elated to be in the Capitol, as is clear from his tone.  He cheered and fist-bumped rioters and one Capitol Police officer.

Evans decided to leave the building ostensibly because he did not have cellular service inside the building and could not broadcast his livestream.  Evans made his way back to the Rotunda Doors, the same doors through which he entered.  By this time, Evans had removed his helmet:



*Exhibit 3A – CCTV showing Derrick Evans approaching the Rotunda Doors from the inside at approximately 2:49 p.m., Evans is highlighted by a red circle*

It took Evans about 30 seconds to push through the Doors, which had become a choke point of rioters simultaneously trying to exit and enter the Capitol building.  Capitol Police were also blocking the Doors, trying—without much success—to facilitate rioters' orderly exit while  preventing new rioters from coming in.

19



*Exhibit 3B – CCTV showing Derrick Evans trying to get through the Rotunda Doors, circled in red, Capitol Police jammed between exiting and entering rioters circled in blue*

Evans can be heard on his livestream asking if there is another exit, but he ultimately proceeded through the Rotunda Doors, which is when his livestream video ended.  Evans exited the Capitol building at approximately 2:50 p.m.

Almost immediately after ending his livestream, Evans contemplated deleting the video from Facebook.  At 2:59 p.m. on January 6—less than 10 minutes after he left the Capitol building—Evans asked a friend to download a copy of his video "so [he] can delete it":



*Exhibit 3A – Text message sent by Evans on January 6, 2021, at 2:59:26 p.m.*



*Exhibit 3B – Text message sent by Evans on January 6, 2021, at 3:04:56 p.m.*

Evans asked his friend, "Should I delete [the video]? So there's no evidence of what I just did?" Evans did, in fact, delete the video some time later.

Due to his public profile and his livestream, Evans was identified as a person who breached the Capitol building almost immediately after January 6.  On January 8, 2021, Evans was charged by complaint with violations of 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(3)(2).  On January 9, 2021, Evans resigned his seat in the West Virginia House of Delegates.  In a statement, Evans said,

"I take full responsibility for my actions, and deeply regret any hurt, pain or embarrassment I may have caused my family, friends, constituents and fellow West Virginians."

*Evans's Voluntary Debriefs*

Evans participated in two voluntary debriefs after he was arrested and charged. Evans expressed remorse for his conduct and a desire to take back what he'd done. Evans said that, once he learned that someone had been shot inside the building, he knew that he had made a mistake.

However, Evans minimized his conduct and made claims in both debriefs that were directly contradicted by his own livestream video. For example, in the first debrief, Evans said that law enforcement officers were letting rioters into the Capitol building. In the livestream video, Evans sees a police officer fleeing the Rotunda Doors and says, "There's cops on the inside stopping us now!" In the second debrief, Evans claimed that he brought his helmet because he wanted to protect himself against Antifa, but in the video, Evans repeatedly told people around him and his social media followers that it was not Antifa breaching barriers and assaulting law enforcement—it was "Patriots." And the first time he mentioned his helmet in the livestream, it was in response to the Capitol Police officers he saw wearing riot gear, indicating that he wanted to put on his helmet to go toe to toe with police.

Evans claimed that he didn't think his actions through on January 6, that he didn't understand that the bike rack barriers were meant to keep him and other rioters from reaching the Capitol, and that, when he was livestreaming, he was just caught up in the moment. But Evans's careful narration of each advancement of the crowd toward the Capitol building—including multiple mentions of the barriers and exhortations of the police to let rioters through—intermixed with his own rallying cries and expressions of amazement at what the crowd had accomplished,

22

over the course of an hour and 18 minutes, reflected more deliberation and willfulness than Evans was willing to admit.

Evans claimed that he never took #stopthesteal seriously, that it was just a hashtag used to coordinate President Trump's rally—but this claim is belied by his pre-January 6 Facebook posts promoting his belief in election fraud, saying, "This is why we're going to D.C.," and his statements in the livestream stating that the "Patriots" at the Capitol were taking a stand against stolen elections.

## III.    THE CHARGES AND PLEA AGREEMENT

On June 30, 2021, a federal grand jury returned a superseding indictment charging Evans with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

On February 9, 2022, Evans was charged by superseding information with one count of violating 18 U.S.C. § 231(a)(3), Obstructing or Impeding Officers During a Civil Disorder.  On March 21, 2021, Evans pled guilty to the information.  As part of the plea agreement, the government agreed to dismiss the indictment at sentencing.  Also as part of the plea agreement, Evans agreed to pay $2000 in restitution to the Architect of the Capitol.

## IV.    STATUTORY PENALTIES

Evans now faces sentencing on one count of violating 18 U.S.C. § 231(a)(3).  As noted by the plea agreement and the U.S. Probation Office, Evans faces up to 5 years of imprisonment, a

fine up to $250,000, and a term of supervised release of not more than three years.  (Plea Agreement ¶1; PSR ¶¶102, 110, 121.)

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR calculates the Sentencing Guidelines applicable to Evans's offense consistent with the parties' plea agreement.  That Guidelines analysis is as follows:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| Adjustment for Acceptance of responsibility (U.S.S.G. §3E1.1) | | -2 |
| **Total Adjusted Offense Level:** | | **8** |

(*See* Plea Agreement at ¶¶ 3(A).)

The U.S. Probation Office calculated Evans' criminal history as category I, which is not disputed.  (PSR ¶ 52.)  Accordingly, Evans's Guidelines imprisonment range is 0 to 6 months.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this felony case, sentencing is also guided by 18 U.S.C. § 3553(a).  Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the

history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of a three-month term of incarceration.

### A.   Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, was a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.  As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.  Depending on the timing and location of their approach, they likely would have observed other extensive fighting with law enforcement.

While looking at Evans's individual conduct, this Court must assess that conduct on a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6)

the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

To be clear, had Evans personally engaged in violence or destruction, he would be facing additional charges and/or heightened exposure under the Sentencing Guidelines. The absence of violent or destructive acts directly committed by Evans is therefore not a mitigating factor in this case.

The nature and circumstances of Evans 's offense weigh heavily towards a meaningful term of incarceration. Evans used his public social media profile prior to the riot to promote #stopthesteal and to encourage people to travel to Washington, D.C. These posts each received thousands of likes and hundreds of comments and shares. Given his public profile, Evans's use of social media during the riot is more aggravating than the average rioter who posted on social media during or after the riot.

Upon arriving at Washington, D.C., Evans did not attend the former President's speech. He went to the Capitol *before* President Trump's speech, before any call by President Trump to march to the Capitol. He began livestreaming at approximately 1:29 p.m. and encouraged his viewers to share the video at multiple points through the hour and 18 minutes that he was livestreaming. Evans received live comments and updates from followers watching the livestream—he was promoting the riot and inviting virtual engagement with it as it was happening.

Evans's livestream publicly projected the riot unfolding on the East Side, with Evans narrating what was going on for his followers. When Evans received updates via comments on

26

his livestream that rioters had breached police barriers on the West Side of the building, Evans stoked the crowd around him: "They're saying that patriots breached the Capitol building! … This is awesome!"  Evans also directly, verbally confronted law enforcement:  "We're taking this country back whether you like it or not! … Shame on all of you! … You listen to your liberal mayor instead of the Constitution … Patriots ain't being quiet anymore.  Patriots ain't gonna stand down to tyranny anymore!  Patriots ain't gonna stand down for stolen elections anymore!"

Evans's statements in the livestream evince a predetermined intent to "take" the Capitol building and establish his awareness of the certification procedure taking place inside.  His statements demonstrate his awareness of the police presence on all sides of the building and his encouragement for "patriots" to overrun the police presence.[3]  He claimed in the video that he wanted to keep it peaceful and that he respected law enforcement officers, yet he continuously encouraged other rioters forward and told police officers to just let the rioters into the building to

---

[3]     That Evans repeatedly told the crowd and his social media followers on the livestream that "patriots"—not Black Lives Matter or Antifa were—inciting and engaging in violence on the West Front is significant.  Many rioters have tried to blame the violence of January 6, without any evidence, on agitators from Black Lives Matter or Antifa.  Others, including Evans, in reference to his helmet, later claimed that they prepared for violence because they thought they would be attacked by Antifa.  Evans refuted such claims about Black Lives Matter and Antifa in real time and donned his helmet himself in response to seeing Capitol Police in riot gear.

avoid violence.[4]  This veiled threat shows an absolute disregard for law, order, and the officers'
lawful duty to protect the Capitol on January 6.

At a critical moment in the riot—the breach of the Rotunda Doors—Evans was part of the
mob that assaulted police officers to gain entry to the Capitol building.  Not only did Evans see an
officer running away from the door, he laughed at officers, mocking their efforts to protect
themselves and the building.

Evans continues to assert, in his sentencing memorandum as he did in his debriefs, that he
was "a person with legitimate intentions caught up in the crowd and the moment," and that his
livestream video "suggests a certain naivete."  (ECF No. 43 at 3.)  To the contrary, Evans's
narration throughout the hour and 18 minutes that he was recording his livestream demonstrates
that his decision to advance on police and enter the Capitol was deliberate.  He first mentions
rioters breaching the Capitol two minutes into his livestream, at around 1:30 p.m.: "They're saying
that patriots breached the Capitol building … this is awesome!"  Eight and a half minutes in, Evans
says: "This is about to get wild.  It is about to go down, man… I think that you might want to get
bail money ready for people who are going to do this."  By the time Evans is in proximity of the
Rotunda Doors, well before he actually enters the Capitol, it is clear Evans himself intends to
thwart police and breach the building:  "We're in here now, they can't stop us now, there's too

---

[4]      In his sentencing memorandum (ECF No. 43), Evans suggests that his occasional
admonishments to fellow rioters to "keep it peaceful," or to not destroy property mitigate the nature
and circumstances of his offense.  These statements, under other circumstances, would be
mitigating.  But here, any discouragement of violence or destruction on Evans's part is completely
subsumed by Evans's consistent *encouragement* of other rioters to charge police, to invade the
Capitol building despite the police presence and barriers indicating that the area was restricted,
and to breach the Rotunda Doors in spite of pepper spray and flashbangs.  Evans even protests
when another rioter says, "It's time to leave"—Evans responds, "No it ain't! The Doors are open!
The Doors are open! It's no time to leave! We haven't done nothing yet!"  And, even as Evans
says he's "try[ing] to keep the peace" he says, "peace is over with."

many of us … They're pounding on the doors!  We're taking this house, I told you today! Patriots stand up! … I'm going in if I can get up there."  Once Evans squeezed into the crowd pushing against the Rotunda Doors, he jostled shoulder-to-shoulder with other rioters for four minutes, saying repeatedly that he is going into the building, before he ultimately crossed the threshold, saying, "We're in! Derrick Evans is in the Capitol!"

As for naivete, Evans was well-informed about what was going on inside the Capitol—the certification, counting the votes, the evacuations, rioters on the Senate floor—and outside of the Capitol—"Trump supporters storming the building on the other side right now!"  And he communicated that information to the crowd and used it to egg rioters on.  Evans was not a simpleton caught up in a moment.  He was a leader in this crowd, urging everyone forward, past police, into the Capitol.

Evans also asserts in his sentencing memorandum that, if he thought what he was doing on January 6 was wrong, he "probably wouldn't have live-streamed [it] because it would expose him to criminal prosecution."  (ECF No. 43 at 3.)  In fact, Evans knew almost immediately after leaving the Capitol that his livestream was incriminating.  Evans deleted the livestream video in an ill-conceived effort to cover his tracks.  This action shows Evans's consciousness of guilt nearly contemporaneous to the offense.  This action, and Evans's stated motives for deleting the video— to ensure there was "no evidence of what [he] just did."—are aggravating factors when considering the nature and circumstances of Evans's offense.

Evans's conduct and statements on January 6 demonstrate a willingness to incite and engage in violence.  Evans saw Capitol Police officers in riot gear as the battle for the West Front raged and said, "Lemme grab my helmet!"  Evans used his livestream to virtually rally his followers, to issue a call to action as he was showing rioters "flood" the East Plaza.  Evans

leveraged the real-time comments on the livestream to inform and incite the crowd of rioters around him, encouraging the rioters to breach the barriers after he learned that rioters on the West Side were doing so.  His actions and statements show flagrant disrespect for the law, specifically to uniformed police officers.

Evans engaged in two multi-hour debriefs with the U.S. Attorney's Office and FBI prior to his plea and sentencing.  During those interviews, Evans expressed remorse, and the government believes that remorse to be sincere.  Evans stated that he felt great shame over his conduct on January 6, and that, if he could take everything back, he would.  Those sentiments are laudable, and the government credits Evans's early expressions of contrition, including his decision to immediately resign his seat in the West Virginia House of Delegates after his arrest.  Since January 6, 2021, Evans has kept a low profile and been cooperative with the government's investigation into his conduct.  This distinguishes Evans from some rioters with significant public profiles who have used their platforms after January 6 to brag about their conduct or to continue to promote the myth that the presidential election was stolen, justifying the incursion into the Capitol.

That being said, Evans's demeanor and his statements in his livestream starkly contrast with his post-arrest contrition.  Evans's enthusiasm for the riot as it was happening is undeniable, and his real-time promotion of the riot undoubtedly raised its profile.  His remorse after the fact may be genuine, but he recognized *on that day* that the riot was violent and destructive.  Yet, he celebrated the riot, saying, "Today is a test run.  Today is a test run.  We're taking this country back."

## B. Evans's History and Characteristics

Evans is a former teacher, football coach, and an elected state representative. He is currently a real estate investor and a full-time caretaker of his four children. He has no criminal history and has been compliant with his conditions of release. These aspects of his history and characteristics are mitigating.

At the same time, Evans's status as an elected representative on January 6 with a large, public social media presence is a significant aggravating factor. Evans was fully aware that the certification procedure was taking place inside the Capitol on January 6 as rioters surged outside the building. He knew that the certification procedure was suspended—and knew enough to question the political implications of the suspension—and he knew that members were being evacuated from the House and Senate chambers as he stood feet from the Rotunda Doors. He was aware and announced to the crowd around him near the East Steps that "patriots" had made it onto the Senate floor.

Evans used his public profile on Facebook to promote #stopthesteal, traveling to DC on January 6, and the riot itself while it was ongoing. Evans used real-time public feedback from his livestream to propel the riot, most notably by stoking rioters on the East Side of the Capitol because rioters on the West Side were overtaking police.

These actions and statements represent an appalling abuse of public trust—and could be interpreted by the public as an endorsement of violence as an appropriate response to political grievance. Given his knowledge of the certification proceeding and his position of influence, Evans is more culpable than most rioters who posted about the riot on social media, but lacked Evans's visibility. Evans's history and characteristics, including his violent rhetoric on January 6

31

and his position as an elected official, weigh in favor of a term of incarceration in the middle of the applicable Guidelines range.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.  Evans's criminal conduct—obstructing and impeding law enforcement officers engaged in a federally protected function during a civil disorder—is the epitome of disrespect for the law.  When Evans entered the restricted area on Capitol grounds, and the Capitol building itself, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege.  Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger.  The rule of law was not only disrespected; it was under attack that day.  A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct and impede police officers are not taken seriously.  In this way, a lesser sentence could encourage further abuses.  *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[5]      Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                          at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals:  general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).  The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

---

[6]    *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Although Evans has consistently expressed remorse for his conduct and has been cooperative with the government's investigation, he also has minimized his conduct and made contradictory claims during his interviews with the FBI about what he did on January 6 and why. Despite Evans's considerable contrition, it is not clear that Evans has ever grasped the gravity of his personal role in the riot or come to terms with just how deliberate each of his actions were on January 6.

Moreover, Evans did not express remorse until after he was arrested and charged. *Cf. United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Given the very brief period of time between the riot and Evans's arrest, it is impossible to know if Evans would have expressed contrition without getting caught. But Evans's early identification and arrest were also of his own

making—his livestream was widely disseminated over the internet, even after he deleted it.

Evans himself makes the argument for deterrence.  In his sentencing memorandum, Evans characterizes the riot as, "an example of democracy (albeit dysfunctional) in action."  (ECF No. 43 at 5.)  He includes a quotation of Thomas Jefferson, stating that "a little rebellion now and then is a good thing," and rebellions should be "*so mild in their punishment ... as not to discourage them too much*."  *Id.* (emphasis added).  Evans thereby equates colonists' 18th century fight for independence from the Imperial British with the January 6 assault on this country's democratically elected government.  This argument is nothing less than a continued attack on the rule of law and a dangerous endorsement of political violence.  But, taking the argument at face value, if this Court wants to discourage political violence, the punishment in this case should not be mild.

A meaningful term of incarceration is necessary and appropriate in this case to impress upon this defendant the significance of his actions such that he will be deterred from taking such action again in the future.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."  *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that Asignificantly increases the likelihood that the sentence is a reasonable one."  *Rita*, 551 U.S. at 347 (emphasis in original).   In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.' "  *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.  This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis.  In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Evans and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to obstruction-related conduct in other cases.  To try to mechanically compare other § 231 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Evans is among the first Capitol Riot defendants to plead guilty and be sentenced for a single count of 18 U.S.C. § 231(a)(3).  The Court may consider, for reference, the sentences imposed on Daniel and Darryl Johnson, 21-cr-407 (DLF), who were each sentenced on single counts of § 231(a)(3).  Like Evans, the Johnsons—a father (Daryl) and son (Daniel)—participated in the storming of the Rotunda Doors, but the Johnsons were part of a mob of rioters assaulting police guarding those doors from the *inside*, whereas Evans was outside.  The fact that the Johnsons were already inside the building, facilitated an additional breach at the Rotunda Doors from the inside, and were closer to the door—and therefore, closer to police officers as they were assaulted—renders their conduct somewhat more aggravating than Evans's.  On the other hand, while Daryl Johnson made chilling statements on social media about the riot, neither Johnson had Evans's public profile or gave the riot as much real-time exposure as Evans did with his livestream. Daniel Johnson, who had a higher Guidelines range than his father due to his elevated criminal history category, was sentenced to four months' incarceration.  Daryl Johnson was sentenced to 30 days' incarceration.  A sentence of three months' incarceration for Evans would not result in an unwarranted sentencing disparity for Capitol Riot defendants sentenced for violations of 18 U.S.C. § 231(a)(3).

This Court may also consider its own sentence imposed on Nolan Cooke, 22-cr-52 (RCL). Cooke, like Evans, pleaded guilty to a single count of violating 18 U.S.C. § 231(a)(3).  Like Evans, Cooke broke through the barriers on the East Side and was a member of the mob fighting police at the Rotunda Doors.  While Cooke did not enter the Capitol building—which mitigates the nature and circumstances of his offense—he much more directly engaged with law enforcement officials both at the bike rack barriers and near the Rotunda Doors, subjecting him to an additional three points for "physical contact" under the Sentencing Guidelines.  *See* U.S.S.G. 2A2.4(b)(1)(A). Thus, Cooke faced a higher Guidelines range—8-14 months as opposed to Evans's 0-6 months. The government, as here, recommended a sentence at the midpoint of the Guidelines range, and this Court accepted that recommendation.[7]

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[8]  *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering

---

[7]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8]     The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Evans must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Evans played in the riot on January 6.[9] (Plea Agreement at ¶ 12.) As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Evans's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. (*See* PSR ¶ 125.)

## VIII.   FINE

Evans's conviction under Sections 231(a)(3) subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

---

[9]     Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

The government has recommended that the Court impose a fine on defendants who sought to profit from the riot.  For example, the government determined that a fine was appropriate in the case of Scott Fairlamb, 21-cr-120 (RCL).  Fairlamb raised over $30,000 in an online campaign styled as a "Patriot Relief Fund."  The website indicated that the funds were to be used for mortgage payments, medical insurance, attorney fees, and monthly bills.  The government argued that a defendant should not be able to "capitalize" on his or her participation in the Capitol breach in this way.

As of June 2, 2022, there was an active fundraiser for Evans on the website givesendgo.com for Evans's "legal defense."  The fundraiser appears to have been removed from the givesendgo site as of the date of this writing.  It is unclear whether Evans organized this fundraiser or someone else organized it on his behalf.  The government does not know if Evans has tried to utilize any of these funds.  Given the dollar amount—which was relatively low—and no promotion of the fundraiser on Evans's part, the government does not seek a fine in this case.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of three months, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, three years of supervised release, restitution in the amount of $2,000, and the mandatory $100 special assessment his count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: _____

Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Criminal Division
Detailed to the D.C. U.S. Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048